Good morning, Your Honours. If it pleases the Court, I can be very brief. This is kind of like a coulda, woulda, shoulda, but when you talk about coulda and shoulda, that's the problem confronting me in this case. If I look at page 17 and 18 of Judge Nunley's decision, his criticism was that not that I didn't come into court and say everything that Mr. Salyer had told me, which would be difficult with the attorney-at-large privilege, but that it didn't correct a statement that I had made to Mr. Carlson the previous Friday, which was that I — my didn't believe me, and he told the Court anyway that he didn't believe me, and he wrote a letter to me the next day saying he didn't believe me. And the Court issued that, and, frankly, I made that statement to Mr. Carlson not thinking it was going to go to the Court. I didn't think I had a duty to go to the Court to correct it, and nor, if Mr. Carlson didn't believe me, did I think I had a duty to call him up after I found out what was really happening over the weekend. In fact, I think I did what my ethical duty was, which is withdraw. There was a situation where it was clear that this was going to be one in which was going to get a lot more complex than I wanted to get involved in as a favor. So the real question is, is whether there's a shoulda requirement that I have appeared in court and tell Judge Bardwell. The difficulty of that as a lawyer, when you're appearing in court, is that it can get a whole lot bigger than that once you appear in court. A judge could say, I order you in a mandatory manner to go do this, this, and this. Well, the Court was concerned because you gave some information to the trustee's lawyer, Mr. Carlson. There was evidence in the record that the district court looked at that indicated that you hadn't investigated and confirmed that the drumline had shipped at the time you told that to Mr. Carlson. And you didn't correct the information that Mr. Carlson then transmitted to the Court, which you knew about because you received a copy of his affidavit. So the Court said, it seemed like the gist of the Court's view that you had baffled their efforts to keep the drumline in California was that you hadn't corrected the information you gave, or at least on the transport prong of the TRO. You hadn't corrected the information, the misinformation you gave to Carlson, Mr. Carlson. Well, if you know the other person doesn't believe you, then the question is, do you need to call him up and say, oh, by the way, you're right, you didn't need to believe me. I'm a little troubled by that requirement, especially when I end up, you're right, I did get a copy of his declaration to the Court that repeated what I had said on the voice message. But I thought the best thing I could do was not go into court and argue the same thing. Well, you didn't correct. I mean, I don't think it's a question whether you went into court or not. I mean, that was a time when you could have corrected that misinformation, but the Court seemed concerned that you hadn't corrected the misinformation. And had you done so, something else would have happened. That seemed to be the gist of it to me. Well, I don't know what the something else that would have happened would have been, because I had no more information other than that. If I had gone to court and said, oh, by the way, the information that I told Mr. Carlson was an error, and actually what I understood at the time, you have to keep it in context, was that I was told that the shipment had already started and couldn't be stopped. Whether I believe that or not is a different issue, but that's what I was told and that's what my information was. Counsel, I'm having trouble understanding exactly what the point is that you're making. With regard to it couldn't be stopped. Are you arguing, no, the merits of your case, and are you arguing that it's not supported by the facts and the circumstances, or are you bringing a charge against either one of the two judges involved with respect to how they conducted their summary judgment hearings? I just don't. Are you asking us to take this on the merits flat out and telling us there's not enough there to support it? Is that what you're doing? I think that would be the same thing as the second point, which is that since this was a motion for summary judgment, it shouldn't have been granted. That wasn't very clear in your briefs, but what do you want us to do? As far as I understand it, and correct me if I'm wrong, you're not entitled to a right to a jury trial on something like this. Correct. So what do you want us to do? Tell us exactly if we were to agree with you on the second point that there was something defective about the summary judgment credibility, what do you want us to do? Well, actually, what I'd like you to do is set the record straight. If there's, in fact, a duty in this situation that requires an attorney to appear in court and tell a judge that what isn't already believed anyway is — I'm not sure what I would have said under the facts that I have. The real question is, does the law say that I can withdraw from a factual situation before ever becoming part of it? But what are you asking us to do with this case? I'm asking you to reverse the decision. And do what with the case? And actually, I want you to reverse it and not send it back. So you want us to decide as a matter of law that there are no circumstances under which this record would support you having been held in contempt? I actually believe that to be true. Okay. Let me — I neglected to ask you, one, to introduce yourself for the record, but also, are you planning to share any time with Mr. Rose, who is also here, because there's only one time on the clock? I'm done. Okay. Can you introduce yourself for the record, please? Larry Lichtenegger. Thank you. If it pleases the Court, I am Gerard Rose. I am the appellant in this matter, along with Mr. Lichtenegger. Although we have very, very different positions in this case. I'd like to begin by citing some history for the Court. You may recall back in the late 1700s, there was a terrible crime committed on the East Coast. Some British soldiers opened fire on a mob in Boston and ended up killing a number of them. A distinguished lawyer by the name of John Adams decided to take on the defense of the soldiers, and there was a great national debate over whether it was appropriate to tar a lawyer with the misdeeds of the client. And the — what came from all of that was that, no, we don't — we don't tar lawyers with the misdeeds of their client. Unfortunately, that's precisely what happened in this case. I have been tarred with the misdeeds of someone who was accused and convicted of some terrible things against the public, Scott Salyer. And because I represented Scott Salyer's children as a trustee and as a lawyer, I have been tarred with those misdeeds of Mr. Salyer. For example — As a trustee, you're more than just a lawyer, right? Oh, sure. You're the legal owner of those properties of the race. Yeah. And because of that, you would have thought that before these items were shipped out of the country, I would have been consulted. I was not. So you owned the — you were the trustee for the trust that owned the company that owned the drumline and that was shipping the drumline. That's true. Again, you would have thought somebody would have asked me. But you actually had the authority and the legal authority to stop the shipment. I did. The trouble was nobody told me they were about to be shipped. I had — the only information I had at the time they were shipped was I made a call to Scott Salyer's lawyer. Remember, I was representing the children, not — and I was a trustee. I wasn't representing Scott Salyer. So the drumline was stolen from the trust since you — Yes. Okay. So you pursued it to get it back. Is that correct? What I tried to do was to find out who shipped them out of the country. And once I found out — and the first time I found out where they were, they were out of the country. So what I did was I found out where they were shipped. They were shipped to a fellow in New Zealand. And I tried to contact him, and he wouldn't talk to me. Because by that time, I was radioactive, frankly. I couldn't get anybody to talk to me. So just to put this in perspective, I suppose that you, too, are asking us to remand with orders to a grant to enter judgment on your behalf. I would like that. Is that what you're asking us to do? Well, actually, what I asked for in my brief was to send it back for an evidentiary hearing. I had requested an evidentiary hearing very early on. But in no place that I could find did you suggest what you might be able to demonstrate or prove in an evidentiary hearing. What I intended then to — But is it in the record where you showed what you might prove, made an offer of proof, what you could develop in an evidentiary hearing? What I did in the record was itemize each one of the errors. I thought that the bankruptcy — But you never once indicated what your evidence would show in the evidentiary hearing that would contradict all this, did you? No, because the — both Judge Bardwell and the district court judge, Judge Nunley, both came to the conclusion that I was lying because my testimony was self-serving. So that's why you offered no evidence that you would bring forward in an evidentiary hearing, because you concluded that it was of no value? Oh, no. The record is replete with all sorts of — Well, what would your evidentiary — — tribal issues of fact. What would your evidentiary hearing then possibly produce if you concluded that you were a tribal issue of fact? Well, unfortunately, that's what happened. What I would show and what I would demonstrate are the things that I set out in my brief. An offer of proof in the record? Yes. Of what you're — Yes. Where is that, please? Yes. When I — when you make a motion for summary — as you know, Your Honor — when you make a motion for summary judgment, it is opposed by the other side, and the other side sets out what he or she believes are the tribal issues of fact. And I did that at some length. Well, if we accept the proposition that it was inappropriate for the court to rule on this in the context of a summary judgment motion because the court — bankruptcy court, as I understood it, made factual findings and credibility determinations, so the procedural posture was inappropriate. We send it back for that reason. The judge is going to do exactly the same thing that was done before, so isn't that just a waste of time to do that? I'm not so cynical, Your Honor. I've been — Well, I don't think it's — I don't think it's cynical. We're not being cynical. I mean, isn't that the practicalities? We've all read that decision. Your Honor, I've been practicing law for 44 years now almost, and I have seen judges change their mind, and I believe I could change the mind of this judge. Unfortunately, I never — I was never even able to make oral argument in front of Judge Nunley. And Judge Bardwell — That's the district court. What about Judge Bardwell? Judge Bardwell basically gave us a few minutes to argue our case after he had already written his opinion, but we were never given an opportunity to present the evidence that we had requested that we be allowed to enter. Did you attempt to pursue the equivalent of a 60B motion or anything like that? No. An attempt to straighten out what you now say were errors in the summary judgment process? Why not? Because, frankly, we were up against a notice — the appeal time for a notice of appeal. If the bankruptcy court did not change its credibility determination because basically it indicated that it didn't credit your statements or Mr. Lichtenegger's statements, is there anything in the record that would create a genuine issue material fact as to contempt? Oh, sure. Sure. Can you explain? Sure. For starters, there's no evidence that I — with all due respect to counsel, there's no evidence that I misrepresented any fact to anybody ever. Ever. Not once. Secondly, there's no evidence that I actively participated in the shipment of the drumline out of the country. None. And, in fact, I didn't. I played no role in that. You say he had already — the bankruptcy judge had already written his opinion? Yes. Did he give you a copy of that? Yes. And did you point out at that point you can't make credibility determinations in a motion for summary judgment? Yes. What was his response? He said, I don't like making these kinds of rulings, but I'm going to in this case. Is that in the record? Yes. Could you tell me in the record what that is? Well, I mean, it was during the oral argument. So is there a transcript in the excerpt of that? Sure. Yes. And where is it in the excerpt? I believe it's in the record. Can you point me to it? No. Not this morning. I'm sorry, Your Honor. But the point is, as an officer of the court, I'll represent to you that basically Judge Bardwell just adopted his previous ruling almost completely. I mean, for example, I was accused of having tried to mislead the court by producing redacted records that weren't even redacted by me. They were redacted by counsel for the other side. Well, he gave you an opportunity to address that in the argument. Yeah. Am I correct? And counsel, to his credit, got up and said, well, no, Mr. Rose didn't redact those records, I did. And then Judge Bardwell went ahead and included that, the fact that I had supposedly redacted these records anyway. I mean, so. So on the alternative, you would like to go back to the bankruptcy court for the equivalent of a bench trial? Absolutely. I think that's what's appropriate. And frankly, I, again, I've been practicing law for a long time. I still believe that judges can change their minds. Do you want to save any time for rebuttal? Oh, sorry. Thank you. We'll hear from the other side. Unless you have further questions. I mean, I know you've read the record. Obviously, you know it well. So thank you. Good morning, Your Honors. My name is Todd Russell of McGuire Woods on behalf of the Appellee Bank of Montreal. I've never seen a summary judgment motion where all of a sudden they start making credibility findings. I mean, that's sort of black letter law that you cannot do that in a motion for summary judgment. What am I missing? I mean, that's what happened, correct? Correct. But Judge Nunnally actually accepted the affidavits and reviewed them on the appeal and found that there was no . . . I don't know how you erased that error. I don't believe that Judge Bardwell . . . How do you erase that error? Is it somehow covered up by what Judge Nunnally did in the district court? Well, I guess the question is, was Judge Bardwell's decision based solely on that error? I don't believe it was. Well, no, not solely, but it's, I mean, it jumps right out at you. I'm reading along and all of a sudden credibility to this, and I don't believe this. I'm thinking, this was a trial. This wasn't a summary judgment motion. According to Mr. Rose, he was on vacation for the entire period before the TRO to the time the TRO was executed to and had no knowledge of it. And so unless you disbelieve him, it's pretty hard to see how any information or misinformation to the court had anything to do with Mr. Rose. So if you take the affidavits and representations of Mr. Rose and Mr. Lichtenegger at face value, which the court should do, I presume, on summary judgment, then it's pretty hard to see why there's not a genuine issue material fact as to the factors the court determined merited a contempt ruling. I believe in looking at all the facts, the judge looked at the fact that Rose initially argued first he was not counsel for CBS. I think there's ample evidence to show that Mr. Rose was acting as counsel for CBS. He accepted service of the papers, and he also sat at the court. But now you're asking to resolve factual disputes. Yeah, the standard isn't whether there's ample evidence. It's whether there's a material issue fact. The question is, I understand yours. You're in a tough position. We appreciate that. I am in a tough position, but I believe that there is not the affidavits that were provided by Mr. Rose and Mr. Lichtenegger did not rise to the level to create a genuine issue of material fact. You have the evidence of what they said in motion on the 21st. How is it what the judge said? The judge made credibility determinations. It's a little bit like Scott v. Harris, if you remember that case with the Supreme Court on summary judgment. But that isn't what he said. He said, I'm making credibility determinations, not that these affidavits, for some reason, fail to rise to the level that they create a triable issue or a disputed fact. He didn't say it. I guess the question is, what do we do from here? Right. Because we're going to end up in the same place. Well, the other side says no. They said they didn't have a chance to put on all their evidence and that they were entitled to an evidentiary hearing and fact-finding by the court in a trust at a bench trial. Well, there are, I mean, there is no entitlement to an evidentiary hearing. They don't. There's no entitlement. Correct. There's no entitlement to an evidentiary hearing. But that doesn't mean there's no prohibition against one either, if you can show grounds that they're for an evidentiary hearing. Well, they had not, under local rules, they had not requested an evidentiary hearing as well. Well, when you saw the tentative opinion, why didn't it jump out at you? Oh, my goodness, this is full of credibility determinations. You know, I'm going to win this here and it's going to go down in flames, maybe, you know, on appeal or in the district court. I mean, didn't that just fire right out at you? Well, Your Honor, no, and that is my error. But what I will state is that I did come in and I did correct the statement regarding the redacted records. I wanted the court to make that understanding. Our argument was that there was substantial evidence, that there was no genuine issue of material fact, that these, that both, like I said, that there was ambulance, they were both acting as counsel for CVS. They both had knowledge, actual knowledge of the TRO as it was entered, and they both did nothing to stop the drumline from being shipped but actually acted in concert with Mr. Sawyer to have it shipped. After the fact, Mr. Lichtenegger submitted yet again another declaration after the fact and reiterated the same facts, which he knew weren't true in response to the preliminary injunction. What's the strongest evidence that Mr. Rose or Mr. Lichtenegger violated, say, the transport prong where the court said, you and your cohorts will not transfer ship, et cetera? What's the strongest evidence in the record that they violated that prong? The thing is they're supposed to take all actions. They took no actions. And what did you present that they should have done that they didn't do? Well, what we have is we have the statements that they had told the trustees' counsel that it had already started as Mr. Lichtenegger stated today. He said it had shipped and your motions moved. But that obviously made no difference because the TRO issued anyway. So I was, like, struggling to see what is it that they did or should have done that would have stopped the transfer of the drumline because it seemed like Mr. Salyer was pulling all the strings on that. So help me understand what's the strongest evidence in the record that they violated the order. Well, Mr. Lichtenegger never corrected his statement. He could have easily have gone to the court and explained it. And what difference would that have made if he had corrected his statement? Well, as Judge Bardwell stated in his order, additionally supported by Judge Nunnally, is that they could have altered the order or they could have issued an order stopping the shipment of the drumline from the Oakland port. If he knew it was in the Oakland port. And so is there evidence he knew it was in the Oakland port? Because he says, I was just told it couldn't be stopped. No, he stated within, I think, I apologize, I'm trying to remember now. I thought it was within his affidavit. He stated he was told it was in the port of Oakland, and at that point he was told it could no longer be stopped from being shipped out of the country. Is this a memory of yours, or can you point us to a place in the record where we can verify it? I apologize, Your Honor. I don't remember specifically on that. I know it came out. We're getting a lot of body language. I know. I apologize, Your Honor. He knew it was still in the state of California. So this is contempt by omission. Is that what you're telling us? After the TRO was entered, correct, Your Honor. They took no actions to stop it, despite the knowledge that they had. We have the fact of the phone records where we know that Rose and Ligonier spoke, that they spoke for 15 minutes. But apparently they couldn't hear each other for 15 minutes. And under those circumstances, it appears that obviously they had the opportunity to speak. So they spoke. So they denied they spoke. They said that he was walking around the block and they were trying to find a place where they could hear and they never were able to talk. So that's their representation. So if the court disbelieves it, then they spoke for 15 minutes. And so then the question is, okay, how did that violate? What's the evidence that that violated the TRO? That they had knowledge of the TRO but took no action to stop it. And so the assumption is that they knew where the drumline was. And who had knowledge. And who – well, everyone, the trustee knew that Salyer had knowledge. I mean, there was no question about that, and the record seemed pretty clear. Well, they assumed, but they didn't have any specific knowledge that there was nothing – they had not received any of the shipping. They had not received any direct knowledge that Mr. Salyer was behind the shipping of the drumline. They assumed, because Mr. Salyer was S.K. Foods, but they had no knowledge that Mr. Salyer was the party. By they, you mean the trustee. The trustee was completely innocent that Mr. Salyer was behind any shipping of the drumline. Is that what you're saying? Well, they assumed – no. I'm saying they had an assumption, but they didn't have direct knowledge. But they didn't have any direct knowledge that the lawyers did either. I mean, I just didn't see anything in the record really pinning it down. Right? But any knowledge of whether it was in the Port of Oakland or not allegedly came from Mr. Salyer. I think it was the Sunday, the day before the T.R. entered. That's when Mr. Lickeninger had his discussion with Mr. Salyer. Correct. So the assumption is that some communication took place that should have been reported to the court. Is that what you're saying? Correct, Your Honor. Okay. You've got issues of material fact on how the $350,000 contempt citation was arrived at, don't you? That is the value that was placed on it by Mr. Rose when they did the initial sale. And he said it was worthless because it had been vandalized by the time it was actually recovered. Isn't that right? Well, if – So there's an issue of fact there as to whether it had been vandalized and how much it was worth. Well, the case – and I don't remember the case, but that would be then benefiting if we found that they're in contempt of the T.R.O. and it's their actions that allowed for this to be moved and damaged and they should not get the benefit of providing the ability to ship it out of the country and where that was a reasonable assessment of the value given the facts and the evidence that was available. The value at what time, at what point? They had – that was – the agreement was entered into about seven or eight months before. And does the record show when it was damaged to reduce its value as they argued to nothing? No, Your Honor. There was not what we – So why isn't Judge Faber right that there's a dispute of fact about the value? I don't know how we would otherwise prove when it was damaged or how – That's what trial lawyers do is approve things. I understand, Your Honor. And with burdens of proof and all that stuff, that sort of sorts that out. I understand, Your Honor. I believe under the facts and circumstances of this case, given the value that we had shown and the ultimate award that was awarded in the case, over a million dollars for the value of the drumline. Additionally, we did not seek attorney's fees and costs that were incurred by the trustee in this case. That the fact that their actions allowed or provided the ability of the shipping of the drumline out of the country, and therefore the drumline was no longer available for review, that the $350,000 was a reasonable and justified award in the circumstances of this case. The Supreme Court just issued an opinion reversing the Ninth Circuit. A Goodyear-Tyer-Behager saying that sanctions based on inherent authority have to be only compensatory. And so a very narrower standard, a stricter standard. How does that – if you're familiar with that case that just came out a few days ago, how would that apply to this award? Because the drumline was an asset of the State and then ultimately assigned to BMO because it was part of our collateral. If the compensatory portion is that was the value of the drumline that was placed on it, so that was the lost collateral. And so it's compensatory to the Estate and ultimately Bank of Montreal, my client, because it was the value that was lost. Ultimately, later in the case, the ultimate value that was placed on the drumline was over a million dollars in the underlying adversary proceeding. And so we had placed on it evidence that the drumline was actually valued substantially more and this was based on information that was provided after the drumline had even been shipped to Australia that with $400,000 of repairs that it would be worth $1.5 million. So this is after it had already shipped and therefore we did not seek the higher amount. We thought it was fair, reasonable, and justified under the circumstances to rely on the $350,000 number that had been placed on the drumline by Mr. Rose just shortly before the transfer had taken place. So I think based upon the evidence, there was ample evidence to show it was worth well more than the $350,000 and that the $350,000 is purely compensatory for what was lost from the Estate. I didn't have anything further. I believe the record is ample and it was supported by the evidence there was no genuine issue material fact that they represented CVS at all relevant times. They had actual knowledge of the TRO and as the district court stated, each of them took no actions in complying with the transfer decision in the TRO and instead purposely evaded it. And under those circumstances, we would request that you affirm the district court's order. Thank you. Thank you. Thank you. Okay. Do you have a minute for rebuttal? All right. The case of Lichtenegger and Rose v. Bank of Montreal is submitted. We thank you for your argument.
judges: Trott, Ikuta, Faber